UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KENNETH DEMOSTHANE<br><br>Defendant | CRIMINAL No. 23-cr-10144-FDS |

**SENTENCING MEMORANDUM OF THE UNITED STATES**

The United States respectfully submits this Sentencing Memorandum in the above-captioned case, currently scheduled for sentencing on October 22, 2024. The Government believes that a period of imprisonment of 51 months, followed by three years of supervised release is the appropriate sentence for this case. Although this recommendation is at the bottom of the Government's Guidelines Calculation range, it is sufficient but not greater than necessary.

   I.   **Procedural History**

On Monday, July 15, 2024, the United States District Court (Saylor, J.) accepted the change of plea of Defendant, KENNETH DEMOSTHANE ("DEMOSTHANE" or "Defendant"), to the Indictment alleging four counts; two counts of use of Assaulting, resisting, or impeding certain officers or employees and aiding and abetting, in violation of 18 U.S.C. § 111(a)(1) and 2; and two counts of robbery of any person having lawful charge, control, or custody of any mail matter or any money or other property of the United States and aiding and abetting, in violation of 18 U.S.C. §2114 and 2.

DEMOSTHANE faces the following maximum penalties on Count One and Count Two of the Indictment: a sentence of up to 20 years of incarceration where a dangerous weapon is

used (Count 2), 8 years where contact made with victim (Count One); fine of $250,000, supervised release of up to 3 years, and a mandatory $200 special assessment. DEMOSTHANE faces the following maximum penalties on Count Three and Count Four of the Indictment: a sentence of up to 25 years where a dangerous weapon is used (Count Four), 10 years where contact made with victim (Count Three); a fine of $250,000, supervised release of up to 3 years, and a mandatory $200 special assessment.

There is no Plea agreement between the government and DEMOSTHANE.

## II. Factual Background

*November 29, 2022 – Conduct*

On November 29, 2022, at approximately 1400 hours, VICTIM 1, a USPS Letter Carrier, was delivering U.S. Mail on Hiawatha Road, part of his delivery route in Mattapan, MA. While exiting a small apartment building, located at 8 Hiawatha Road, VICTIM 1 first noticed an individual, later identified as DEMOSTHANE standing on the front porch. As VICTIM 1 exited the address, DEMOSTHANE entered the vestibule of the building.

After exiting the building, VICTIM 1 continued his delivery route on the even numbered side of Hiawatha Road. In front of 2 Hiawatha Road, DEMOSTHANE approached VICTIM 1 and said, "Can I ask you a question?" DEMOSTHANE then stated to VICTIM 1, "I'm going to need your master key."

DEMOSTHANE then reached into VICTIM 1's U.S. Mail satchel, grabbing his arrow key. VICTIM 1 stated that DEMOSTHANE, "yanked pretty hard" on the key which was secured to VICTIM 1's clothing per USPS policy with a brass chain. The mechanical force employed by DEMOSTHANE caused the brass chain to break, allowing him to flee in possession of VICTIM 1's USPS Arrow key on foot up Mattapan Street. In addition to the USPS arrow key, VICTIM

1's key ring contained a fob for the SoMa Apartments, located at 15 Bismarck St., Mattapan, MA, and a third unidentified key.

A review of surveillance video from the area showed a Toyota Corolla sedan, color gray, bearing a Zipcar decal on its rear passenger doors, drive down Hiawatha Road to the intersection with Blue Hill Avenue, in front of 2 Hiawatha Road at approximately 1400 hours. The car then reversed into the on-street-parking spot in front of the address, before ultimately stopping at the on-street-parking spot behind 7 Hiawatha Road. The car was operated by a second, unidentified individual, later identified as Myesha Lewis ("LEWIS"). On video DEMOSTHANE is seen emerging from the right front passenger door of the car. DEMOSTHANE walking to the rear of the car, and ultimately to the front left passenger window, where he appears to speak with LEWIS through the open driver's window.

DEMOSTHANE was observed on video walking on Mattapan Street toward Blue Hill Avenue on foot and turning right on to Hiawatha Road. DEMOSTHANE was then observed engaged in the exchange with the carrier and conducting the robbery of postal property, as previously described by VICTIM 1. This included VICTIM 1 being pulled off the front steps by the force of the assault, as DEMOSTHANE violently pulled at the USPS arrow key in order to wrench it loose. DEMOSTHANE is then seen fleeing in the same direction of the parked Toyota Corolla operated by LEWIS.

*December 16, 2022 – Conduct*

Then on December 16, 2022, at approximately 1650 hours, VICTIM 2, a USPS Letter Carrier, was delivering U.S. Mail on Park Street, part of his delivery route in Hyde Park, MA. At the intersection of Park Street and Arlington Street, DEMOSTHANE and LEWIS, who unknown to VICTIM 2, rapidly approached him. One of the defendants, DEMOSTHANE or LEWIS,

produced a black handled knife with a silver blade approximately 2.5" – 3" long as they approached VICTIM 2 and said, "Give me your fucking arrow key." VICTIM 2 put his hands in the air and attempted to remove the arrow key that was secured to his clothing per USPS policy with a brass chain. LEWIS or DEMOSTHANE pulled on the chain while attempting to cut it with the knife, while LEWIS yelled at VICTIM 2 to, "Hurry up."

After taking the arrow key from VICTIM 2, LEWIS and DEMOSTHANE fled up Arlington Street in the direction of River Street. The weather conditions present at the time, heavy wind, and rain, made VICTIM 2's attempts to call 911 difficult. He took shelter on the porch of 105 Arlington Street while reporting the incident. VICTIM 2 told Inspectors that he recalled seeing LEWIS and DEMOSTHANE approximately 45-60 minutes prior to the robbery in the area of 73 Arlington Street. He noted that LEWIS and DEMOSTHANE did not appear wet from sitting in the heavy rain stating that he believed they must have been in a vehicle or inside a building.

A review of surveillance video from the area shows the two individuals matching the description of LEWIS and DEMOSTHANE walking in the direction of the incident shortly before the assault and robbery of VICTIM 2.

*Identification and Investigation*

During the November 29, 2022 assault and robbery of VICTIM 1, DEMOSTHENE was observed on video wearing a black sweatshirt with white or rhinestone lettering, which read "Lonely Hearts Club". USPS Inspectors identified the likely vendor as Massive Action LLC and sought business records; those records showed that the "Lonely Hearts Club" sweatshirt was fulfilled on only five orders shipped to Massachusetts for the entire production run of that product, and one of those orders was to DEMOSTHENE. DEMOSTHENE utilized his Google

email address, kennydemosthene@gmail.com, and cell phone number associated with him during the purchase.

In addition, Inspectors also sought Zipcar GPS business records based on their review of the video from the incident on November 29th. These records placed a 2022 Toyota Corolla sedan, color gray bearing MA registration 3RXV34 at this location on the date and time of that assault and robbery. The vehicle was rented by LEWIS from November 28, 2022 to November 30, 2022. LEWIS used her Google email address, myeshall53@gmail.com and a cell phone number associated with her during the creation of her Zipcar account. Zipcar business records show LEWIS's account was also linked to the Zipcar account of DEMOSTHENE. DEMOSTHENE used the same Google email address and cell phone number to register his Zipcar account that he used for his sweatshirt order from Massive Action LLC.

Inspectors subsequently sought and obtained a search warrant for the historical cell location data for both DEMOSTHENE's and LEWIS' telephone number, which were used to register the ZIPCAR and by DEMOSTHENE also to purchase the sweatshirt. Specifically, the records show that both LEWIS' and DEMOSTHENE's cellphones traveled to the same locations at the same time on both November 29th and December 16th; this linked travel for LEWIS and DEMOSTHENE included concurrent trips north and south of Boston on both days. In addition, this location information (Zipcar GPS and CSLI) included the scene of both robberies, LEWIS' residence, as well as the KFC in Stoughton, where LEWIS is seen on surveillance video. When Inspectors overlayed Zipcar GPS points with the CSLI for both days – LEWIS and DEMOSTHENE's points consistently correspond.

On Friday, May 5, 2023, USPIS executed search warrants simultaneously at DEMOSTHENE's residence in Stoughton, MA and at LEWIS' residence in Dorchester, MA. They recovered a number of items of note from DEMOSTHENE's home in Stoughton, including a black/dark colored sweatshirt bearing contrast "Lonely Hearts Club" writing on the back and emblem on the front, found in a hamper in the laundry room. This sweatshirt appears to be the same as the one worn by DEMOSTHENE during the robberies.  In addition, law enforcement recovered a pair of Red Adidas jogger style sweatpants with contrast/white lines on the thigh and a pair of black Nike running shoes with white/contrast Nike logo from DEMOSTHENE's bedroom. These items both bear likeness to those worn by DEMOSTHENE on surveillance video from November 29th.

When law enforcement arrived, DEMOSTHENE was not home. While some members of law enforcement continued to search at this location, others went to look for DEMOSTHENE. He was ultimately located at his girlfriend's home in Wilmington. DEMOSTHENE declined to speak to law enforcement. Law enforcement seized his phone at that time, pursuant to a warrant.

LEWIS was present at her residence when Inspectors executed the search warrant, and she was wearing a black colored sweatshirt bearing contrast "Nike" writing and emblem on the front. This sweatshirt appears to be the same as the one worn by LEWIS during the robbery on December 16, 2022.  Law enforcement recovered a number of items of note from LEWIS' bedroom at her home in Dorchester. These items included a USPS vehicle key on ring with medallion bearing vehicle number: 0231361. USPS records indicate that on December 17, 2022, USPS vehicle 0231361 was temporarily assigned to Hyde Park and returned to the USPS Vehicle Maintenance Facility to have its locks replaced, for stolen keys. That was the day following the Hyde Park Robbery and VICTIM 2's keyring being stolen.  In addition, law enforcement

recovered a silver folding pocketknife, Vipertek stun gun, and mail in the name of DEMOSTHENE.

LEWIS was advised of her Miranda rights, which she waived orally and in writing and agreed to speak with investigators. LEWIS admitted to law enforcement that she had a Zipcar account and that she was the only individual on the account. LEWIS informed investigators that the Zipcar app was still on her phone. LEWIS admitted to investigators that she knew and was friends with DEMOSTHENE. Investigators seized her phone pursuant to the warrant and it was sent, along with DEMOSTHANE's to a digital evidence laboratory for subsequent forensic analysis.

### III. Legal Framework

The United States Sentencing Guidelines ("Guidelines") are "the starting point and the initial benchmark" in sentencing. Gall v. United States, 552 U.S. 38, 49-50 (2007). Following the Supreme Court's decision in Gall v. United States, "District Court judges can choose sentences that differ from the Sentencing Commission's recommendations—provided of course that they stay within the range set by the statutes of conviction and consider the sentencing factors arrayed in § 3553(a)." See e.g., Gall, 552 U.S. at 41, 49–50 & n. 6. While Gall made the Guidelines advisory, "[t]his is not a blank check for arbitrary sentencing." Id. "Judges *still* must start out by calculating the proper Guidelines range—a step so critical that a calculation error will usually require resentencing." Id. "The reason for this is simple. Congress wants judges to do their best to sentence similar defendants similarly." See Booker, 543 U.S. at 250–54, 259–60. "And starting with the Guidelines' framework—which gives judges an idea of the sentences imposed on equivalent offenders elsewhere—helps promote uniformity and fairness." See Gall, 552 U.S. at 49; Booker, 543 U.S. at 245–60.

After consulting the Guidelines, the Court must craft a sentence that sufficiently accounts for the sentencing factors and objectives outlined in 18 U.S.C. § 3553(a). See Gall, 552 U.S. at 50. In doing so, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. See 18 U.S.C. § 3553(a). The Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant; must impose a sentence that sufficiently reflects the seriousness of the crime, promotes respect for the law, and provides just punishment, and the sentence should adequately deter criminal conduct, protect the public, and provide any necessary education, training or treatment. See 18 U.S.C. §§ 3553(a)(2)(A)-(D). The Court must also strive to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. See 18 U.S.C. § 3553(a)(6). After determining the appropriate sentence, the Court should adequately explain its rationale to "allow for meaningful appellate review and to promote the perception of fair sentencing." See Gall, 552 U.S. at 50. [1]

"Variances are 'non-Guidelines sentences that result from the sentencing judge's consideration of factors under 18 U.S.C. § 3553(a),' while departures are a term of art referring to non-Guidelines sentences authorized and 'imposed under the framework set out in the Guidelines.'" See United States v. Tirado-Nieves, 982 F.3d 1 (1st Cir. 2020) (quoting Irizarry, 553 U.S. at 714); United States v. Adorno-Molina, 774 F.3d 116 (1st Cir. 2014). After the guideline range is determined, the court may "depart" from the guideline range where "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken

---

[1] "In reviewing a sentence for reasonableness, the Court of Appeals first examine whether, in arriving at sentence, the district court committed any procedural errors, such as failing to calculate, or improperly calculating, the advisory Guidelines range, treating the Guidelines as mandatory, failing to consider the statutory sentencing factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence, including any deviation from the Guidelines range" See United States v. Contreras-Delgado, 913 F.3d 232 (1st Cir. 2019).

into consideration by the Sentencing Commission." See Pepper v. United States, 562 U.S. 476, 494 (2011). "If the court departs from the applicable guideline range, it shall state, its specific reasons for departure in open court at the time of sentencing and…shall state those reasons with specificity in the statement of reasons form." See 18 U.S.C. § 3553(c).

**IV.   Sentencing Guidelines Calculations**

The Defendant faces a statutory maximum sentence of either 8- or 20-years imprisonment on the Assaulting, Resisting, or Impeding Certain Officers or Employees charge (Counts 1 and 2); and a statutory maximum of 10-or-25 years imprisonment on the Robbery of Any Person Having Lawful Charge, Control, or Custody of Any Mail Matter or Any Money or Other Property of the United States (Counts 3 and 4). See "Presentence Investigation Report (hereafter "PSR") ¶ 91.

The guidelines as determined by U.S. Probation in the Pre-Sentence Report ("PSR") dated October 15, 2024, were not contested by the parties.

**A. Offense Level Computation**

**¶¶ 28, 29, 35, & 36 - Base Offense Level**

The Base Offense Level for each Robbery: **20**.

The Base Offense Level for each Assault: **14**

**¶¶ 30, 35, & 37 – Specific Offense Characteristics**

The Base Offense Level for Assault (Victims 1 & 2) is increased by **2-levels** because property of a post office, an Arrow key, was taken.

The Base Offense Level for Assault (Victims 1 & 2) is increased by **6-levels** because the victim was a government employee, and the offense of conviction was motivated by such status.

The Base Offense Level for Assault (Victim 2) is increased by **3-levels** because a knife was brandished while the Arrow key was demanded

9

**¶¶ 34 & 42 – Adjusted Offense Level**

The Adjusted Offense Level for the Robbery and Assault (Counts 1 and 3) (Victim 1) is therefore: **22**.

The Adjusted Offense Level for the Robbery and Assault (Counts 2 and 4) (Victim 2) is therefore: **25**.

**¶¶ 27, 54, & 57 – Multiple Count Adjustment**

The Defendant is responsible for committing multiple robberies and assaults here. The Defendant is convicted of committing two robberies and two assaults and doing so on two diverse dates. On each of those dates the Defendant committed one robbery count and one assault count upon the same victim. As such, each date is a "Count Group" because they involve the same victim and same transaction. Each "Count Group" is a unit of prosecution, pursuant to USSG §3D1.4(a), (b) and (c). The offense level is increased pursuant to the number of units assigned in USSG §3D1.4. The Defendant's Offense Level is thus adjusted upward from the greater of the adjusted levels of 25, by **2** – levels to **27**.

**¶¶ 48 – 50 - Total Offense Level**

With prompt acceptance of responsibility, the Defendant's offense level is therefore decreased by 3 – levels, which brings the Total Offense Level is **24** as calculated by US Probation.

**B. The Defendant's Criminal History**

**¶¶ 63 – 68 - Criminal History Computation**

The Defendant has no prior calculable criminal history. Accordingly, the Defendant's criminal history score is 0 establishing the Defendant as a category I.

**C. Sentencing Options**

**¶ 92 - Guideline Provisions**

Based upon a Total Offense Level of 24 and a Criminal History Category of I, the Defendant's advisory guideline range is **51 – 63 months'** imprisonment as calculated by U.S. Probation.

## V.      Discussion of § 3553(a) Factors:

Regardless of whether the Court rejects the Government's proposed guideline calculation, a sentence of 51 months for the Defendant is "sufficient but not greater than necessary." See United States v. Gall, 552 U.S. 38, 44 (2007). Such a recommendation is bolstered by the considerations laid out in § 3553(a) including the nature and circumstances of the offenses, the history and characteristics of the defendant, the seriousness of the offenses, promoting respect for the law, providing just punishment for the offenses, the need to deter the defendant and others, the need to protect the public from the defendant's crimes, and the need to avoid unwarranted sentencing disparities. See § 3553.[2]

### 1.    Nature of the Offenses

The Government asserts that the unchallenged factual information contained in the PSR demonstrates that the nature of the offenses supports a sentence of 51 months. On both November 29, 2022 and December 16, 2022, USPS Letter Carriers were delivering mail in

---

[2] Regardless of the sentencing guideline calculation accepted by this court, there are no appropriate grounds for a finding of a variance or downward departure from the sentencing guidelines. First, the above analysis of the factors enumerated in § 3553 explain why a variance is inappropriate here. See Tirado-Nieves, 982 F.3d 1 (explaining that variances are "non-Guidelines sentences that result from the sentencing judge's consideration of factors under 18 U.S.C. § 3553(a)"). Second, there are no "aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission" to justify a downward departure from the guidelines. The following characteristics of the Defendant and this case render the possible justifications listed in §5H1.3 irrelevant: the Defendant is 24 years old, not an age "distinguishable" from typical cases covered by the guidelines; is mentally and emotionally stable; has no drug abuse condition present to "an unusual degree" that distinguishes the case from typical cases covered by the guidelines. See §§ 5H1.1 – 5H1.12. Further, Defense counsel cannot point to his lack of education and vocational skills as grounds for downward departure, as they are "not ordinarily relevant in determining whether a departure is warranted." See § 5H1.2.

Boston, Massachusetts. See PSR ¶¶ 8 – 23. While completing their routes, the Defendant came into close contact with these Letter Carriers and robbed and assaulted Victim 1, a federal employee, by physical force, and then the Defendant escalated his conduct in robbing and assaulting Victim 2 by using a knife. Id.  During the initial robbery and assault the Defendant grabbed the Carrier's Arrow key, which was secured by a brass chain to their person, with such force that he pulled the Carrier off the front stairs of the building and onto the street.  During the second robbery and assault, the Defendant produced a black handled knife and stated something to the effect of  "Give me your fucking Arrow key…hurry up".  At this point, the Defendant attempted to cut the brass chain securing the key to the Carrier's body. Id.  Alarmingly, the Defendant committed these offenses for his own personal and financial gain, and seemingly without regard or concern for the human life or another person.

In fact, the Government would suggest that given that the motive of an individual in illegally obtaining a USPS Arrow key, which is to serve as a conduit to commit mail theft, identity theft, and bank fraud, the Defendant's flagrant conduct and the actions he elected to cultivate depict someone with little regard for the impact of their actions, even beyond the instant crime before this Court, which includes but is not limited to the horrific financial and identity related impact to those who rely on the mail to carry out their lives. This remains the case whether the Defendant utilized the Arrow key to enrich himself or profit from there sales to others.

    **2.** **The Defendant's Characteristics and Criminal History**

The Defendant reported to Probation that he has experienced a rough childhood and suffered as a result of his parents' difficult divorce and his strained relationship with his mother. The Defendant stated he relied on his mother for financial support and yet his employment and

education doesn't belie an individual attempting to change his situation. This is particularly ironic given the Defendant who is a grown man informed probation that throughout his entire life his mother has never been held accountable for her actions. See PSR at ¶¶ 70 – 79. Yet in accounting for the approximately thousands of dollars he profited from the theft of multiple Arrow keys nowhere do we see that money factor into changing his life, taking accountability for his situation, or even contributing to living with his mother.  The Defendant has his own car (unclear if he purchased it or not) and lives at home as a grown man with a job. The Defendant reported to Probation that he has had at least a dozen different employers over the last few years, however without any specific dates it is hard to know how long he held any of those jobs. The Defendant did, however, inform Probation that "his sole asset is a 2008 Honda Accord" and Probation reports the Defendant's credit history reflects one account in delinquent status and two accounts in collections status. See PSR at ¶¶ 87 & 89. Yet the Defendant appears to provide himself with a lifestyle divergent from the one painted in the PSR. Looking even to something like the pivotal sweatshirt, worn by the Defendant in the first robbery, which was ultimately located in his home, was shown to retail at Massive Action LLC for $79.99.  Photographs taken in the Defendant's bedroom show a big screen television, gaming system, specialty gaming chair, and many expensive sneakers. See Attachment C to the Government's Sentencing Memorandum. The Defendant admits to a weekly marijuana use but nevertheless, he has reported to Probation that his parents' challenging divorce is the mitigating factor in his decision to commit armed robbery.

      The Government does acknowledge that the Defendant's lack of criminal history is certainly worthy of consideration and has already earned the Defendant deference in the government's calculation at sentencing with a low-end guidelines sentence here. Certainly, the

Defendant's debut entrance into the deep waters of the criminal justice system appear particularly sizable in that he jumped to committing multiple armed robberies of a federal employee; it would nevertheless be remiss of the Government to not also credit his lack of prior court exposure as a 24-year-old man in light of his lack of the significant consequences he now faces.

Next, the Court may consider the Defendant's characteristics. See 3553(a)(1). The Defendant, as previously stated, is currently 24 years old, maintains frequent contact with his father, mother, and sister, and feels supported by his entire family.[3] See PSR ¶¶ 70 - 79. By his own account, he has no serious medical issues outside of ADHD and anxiety, both of which the PSR indicate are currently under control. See PSR ¶ 83. The Defendant has reported no history of mental health conditions or emotional problems. Id. He has reported to Probation that he attended three different high schools in Boston; leaving the first for another, and after only two to three months, before he then ultimately failed all his classes at the second school. The Defendant being in danger of having to repeat his sophomore year at that second high school transferred to a third school, where he ultimately graduated from in 2019. The Defendant planned to attend Bunker Hill Community College; however, he did not return after his first day of classes – deciding school was no longer for him. See PSR ¶ 85. The Defendant's education and work history seems to suggest that the Defendant is someone who continuously looks for the path of least resistance, which has seemingly led him to his criminal conduct and his current engagement in the criminal justice system.

---

[3] The Defendant witnessed and suffered both physical and verbal abuse as a child and as a young man; the Government does not take this abuse lightly. Yet these difficult experiences cannot excuse the terrors he inflicted on the victims.

3.  **Seriousness of Offense; Promoting Respect for Law; Providing Just Punishment**

In November and December of 2022, the Defendant committed extremely serious crimes. The severity of the offense is best showcased by the statement from The National Business Agent for the National Association of Letter Carriers, who articulated the abject fear and trauma the crimes of the Defendant have on carriers. The National Business Agent for the National Association of Letter Carriers wrote in part:

> "Every time a Letter Carrier has his/her back to the public when locking and unlocking their vehicle, every time a Carrier is bent over retrieving mail from a blue mailbox, every time a Carrier is tapped on the shoulder by a customer, or a car stops them to ask for directions, that Letter Carrier will now flinch in fear that they could be the next victim of a Myesha Lewis, Kenneth Demosthene, or someone influenced by their overt actions. On average, Letter Carriers deliver mail for eight, ten and up to 12 hours per day over a 30 to 40-year career. Myesha Lewis and Kenneth Demosthene actions have added a level of stress and anxiety to an already difficult job in which a Letter Carrier should not have to also carry the concerns of being threatened, assaulted, robbed, or murdered."

See Postal Union Impact Statement – Attachment B to the Government's Sentencing Memorandum. Assaulting and threatening a federal employee while they carry out of their duties, particularly by force or dangerous weapon and threatening them, is a blatant disregard for the law. A 51 – month sentence admonishes this illegal conduct and upholds the integrity of the law.

4.  **Specific and General Deterrence**

Specific and general deterrence are also factors for the Court to consider. See 18 U.S.C. §3553(a)(2)(B). Here, the appropriate sentence of 51 – months sends a clear message to this particular Defendant that he will face serious consequences if he continues to down this path and commits additional offenses. A sizable period of incarceration in federal prison will likely make it clear to the Defendant that his behavior has consequences and will not be tolerated or excused. An equally important consideration here is general deterrence. Across the board, this sentence

will demonstrate to similarly situated individuals that those who seek easy money by stealing Arrow keys by leverage human capital and gambling with the lives of federal employees will face a substantial period of incarceration.

The United State Postal Inspection Service reports that from 2019 through 2022 there was a 512% increase nationally year over year in arrow key robberies, rising from 64 robberies in 2019 to approximately 412 robberies in 2022[4]. The intensifying pattern of robberies continued in 2023 with the Postal Service reporting 605 Arrow key robberies, a 49% increase in robberies over the previous year. Id.  The Postal Service is also reporting that based on the number of robberies already this year, Fiscal Year 2024 may end in just as many robberies of Postal Carriers as in the year 2023; with the holidays ahead, there is also concern that the potential number of Arrow key robberies may exceed those from the last fiscal year. In the last two years, 89 postal carriers were significantly injured during these robberies and at least one carrier was reportedly killed. The Defendant is part of this national trend and part of the significant conduct, which necessitates significant consequences; these consequences should not be minimized by giving the Defendant any additional deference.

The Defendant is part of this national trend. He and his co-defendant seized on the opportunity and easy path to money by further exploiting this epidemic and disregarding the lives of others because they heard about it from peers and from the social media. Indeed, they are here in part because the message around these robberies involves the low risk and lack of consequences; it permeates in the community a notion of a lack of general deterrence. The Defendant and his co-defendant account for the two robberies, which are the subject of this case

---

[4] This information was provided in an internal Department of Justice Memorandum from the Executive Office for the United States Attorneys, National Violent Crime Coordinator, Seth Adam Meinero, dated July 17, 2023. Updated information was also provided by USPIS Headquarters on October 15, 2024.

and at least another three robberies that are demonstrated by the evidence in this case, which shows the Defendant was also involved in these too based on the location data derived from his cellphone, the Zipcar GPS points, as well as witness statements, and other evidence. See PSR ¶ 51 and Attachment A to the Government's Sentencing Memorandum.

    **5. The Need to Avoid Unwarranted Sentencing Disparities**

Here, the evidence recounted in the Judiciary Sentencing Information reports (JSIN) instructs why a sentence of 51 – months is consistent with preventing unwarranted disparities in sentencing. During the last five fiscal years (FY2019-2023) there were 112 defendants whose primary guideline was §2B3.1, excluding those who received a §5K1.1 departure, and whom had a Final Offense Level of 24 and a Criminal History Category of I. See PSR ¶ 107. For the 112 defendants (95%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 47 month(s) and the median length of imprisonment imposed was 50 month(s). Id. Thus, a sentence of 51 – months is in these circumstances would ensure there are no unwarranted sentencing disparities.

**CONCLUSION**

The Defendant assaulted and robbed federal postal workers solely for his own gain; those workers who feared for their lives and now a profession, which is constantly now looking over their shoulder, fearing the worst. The Defendant took Arrow keys so that it would open doors enabling him and/or others to illegally obtain thousands of dollars to purchase a lifestyle far more lavish than the one the Defendant's historical path of least resistance could possibly provide him – spend more money he wasn't willing to work to earn. The Defendant made the calculated decision, more than once, to put another person's life at risk rather than working to

obtain these ends legally. The Defendant should be responsible for choices he has made, to do otherwise minimizes the impact that decision has had on others. In consideration of the Defendant's alarming conduct and the factors laid out in § 3553, the Government believes that a 51 – month sentence of incarceration, followed by five years of supervised release is appropriate. As such, the Government respectfully urges this Court to impose this sentence.

                                                Respectfully submitted,

                                                JOSHUA S. LEVY
                                                Acting United States Attorney

By:                                        
                                                LUKE A. GOLDWORM
                                                Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

_____
LUKE A. GOLDWORM
Assistant United States Attorney


Date: October 17, 2024